LANGSAM STEVENS SILVER & HOLLAENDER LLP
65 South Main Street, Suite B102
Pennington, NJ 08534
Tel. (856) 727-0315
By:     John J. McDermott, Esq.
            (jmcdermott@lssh-law.com)
            Lauren E. Krohn, Esq.

GIBBS & BRUNS, LLP
1100 Louisiana, Suite 5300
Houston, TX 77002
Tel: (713) 650-8805
By:     Kathy D. Patrick, Esq.*
            (kpatrick@gibbsbruns.com)
            Anthony N. Kaim, Esq.*

LANGSAM STEVENS SILVER & HOLLAENDER LLP
1818 Market Street, Suite 2430
Philadelphia, PA 19103
Tel: (215) 732-3255
By:     Larry D. Silver, Esq.*
            (lsilver@lssh-law.com)
            David E. Romine, Esq.*

*Attorneys for Plaintiff*
*Occidental Chemical Corporation*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## NEWARK VICINAGE

| | | |
|---|---|---|
| OCCIDENTAL CHEMICAL CORPORATION | ) | |
| | ) | CIVIL ACTION NO. 2:23-cv-1699 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Electronically Filed |
| | ) | |
| GIVAUDAN FRAGRANCES CORPORATION; | ) | |
| THE SHERWIN-WILLIAMS COMPANY; | ) | **COMPLAINT UNDER** |
| PUBLIC SERVICE ELECTRIC AND GAS | ) | **CERCLA SECTION 107** |
| COMPANY; NOKIA OF AMERICA | ) | |
| CORPORATION; PHARMACIA LLC; CLEAN | ) | |
| EARTH OF NORTH JERSEY, INC.; ASHLAND | ) | |
| LLC; TFCF AMERICA, INC.; ALDEN LEEDS | ) | |
| INC.; ALLIANCE CHEMICAL INC.;  BASF | ) | |

CORPORATION; BATH IRON WORKS          )
CORPORATION;  BENJAMIN MOORE & CO.;   )
CNA HOLDINGS LLC;  CONOPCO, INC.;     )
COOPER INDUSTRIES, LLC; ENPRO         )
INDUSTRIES, INC.; GENERAL ELECTRIC    )
COMPANY;  HEXCEL CORPORATION;  ISP    )
CHEMICALS LLC; KEARNY SMELTING &      )
REFINING CORPORATION;  LEGACY         )
VULCAN, LLC; MCKESSON CORPORATION;    )
NEU HOLDINGS U.S. CORPORATION;        )
NOVEON HILTON DAVIS, INC.;            )
PARAMOUNT GLOBAL; PASSAIC VALLEY      )
SEWERAGE COMMISSION; PITT-CONSOL      )
CHEMICAL COMPANY; PMC GLOBAL, INC.;   )
PPG INDUSTRIES, INC.; PURDUE PHARMA   )
TECHNOLOGIES, INC.; SAFETY-KLEEN      )
ENVIROSYSTEMS COMPANY; SEQUA          )
CORPORATION;  SPECTRASERV, INC.;      )
STWB INC.; SUN CHEMICAL              )
CORPORATION; AND TEVAL               )
CORPORATION                          )
                                      )
        Defendants.                   )
                                      )
_____ )

Plaintiff Occidental Chemical Corporation ("OxyChem") files this action for cost recovery under Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9607 ("CERCLA"). By this action, OxyChem seeks recovery of response costs OxyChem has incurred and will incur in the future to respond to work it has been ordered to perform in a Unilateral Administrative Order ("UAO") issued by the United States Environmental Protection Agency ("USEPA") on March 2, 2023.[1]

_____

[1] This CERCLA cost recovery action relates to the upper 9 miles of the Lower Passaic River, which runs through Essex, Bergen, and Passaic counties in New Jersey. With respect to L. Civ. R. 10.1, it was impracticable to state in the first paragraph of this complaint the address of each named party. That information is stated, infra, in paragraphs 37-103.

## I.   **INTRODUCTION**

1.      On September 28, 2021, USEPA issued a Record of Decision establishing an Interim Remedy ("OU4 ROD") for the Upper Nine Miles (the "Upper Nine") of the Lower Passaic River Study Area.

2.      On January 13, 2022, OxyChem submitted an offer to USEPA to perform the *entire* interim remedy the OU4 ROD established for the Upper Nine.

3.      On June 27, 2022, at USEPA's request, OxyChem reiterated its good faith offer to perform the entire OU4 interim remedy, at a cost USEPA estimated to be $441 million. OxyChem sought no material support from the United States to perform this work; instead, it sought only a promise that USEPA would not exceed its statutory authority by trying to bar OxyChem from pursuing its own statutory right to seek contribution from other parties for the cost of remediating pollution they caused and that OxyChem *did not* cause.

2.      Rather than accept OxyChem's good faith offer, which would have spared the United States *all* costs of the interim response in OU4, USEPA instead issued a UAO to OxyChem directing it to perform *only* the remedial design of the OU4 interim remedy.

3.      The costs OxyChem will incur to perform the remedial design of the OU4 interim remedy are consistent with the National Contingency Plan ("NCP"). They are necessary to respond to releases and threatened releases of hazardous substances into the Lower Passaic River and elsewhere within the Site.

4.      In a related action, Case 2:18-cv-11273, *Occidental Chemical Corporation v. 21st Century Fox America, Inc.* et al. ("the *OxyChem* Action"), Judge Arleo ruled that when a party performs work under a UAO, its remedy to recover costs from other responsible parties is a Section 107 claim under CERCLA, not a claim for contribution under CERCLA Section 113. *See* ECF

No. 647 at 8 ("…this Court agrees with the reasoning of the Second Circuit and finds that involuntarily incurred costs are recoverable under Section 107(a).").

5.      In a second related action, Case No. 2:22-cv-07326, *United States of America v. Alden Leeds, Inc., et al.*, the United States alleged that many of the private party Defendants named in this action are jointly and severally liable to the United States under Section 107 for "releases of and threatened releases of hazardous substances into the Lower Passaic River Study Area ("LPRSA") of the Site. The LPRSA encompasses the entire Lower Passaic River from Newark Bay at River Mile ("RM") 0 to the Dundee Dam at approximately RM 17.7." *See* ECF No. 1 ("Alden Leeds Compl.") at ¶ 2; *see also id.* at ¶¶ 36 & 37 ("Under Section 107(a) of CERCLA, 42 U.S.C. §9607(a), each Defendant is jointly and severally liable for all unreimbursed response costs, including enforcement costs and interest, incurred by the United States in connection with OU2 and OU4.").

6.      One or more of the Defendants here has also sued Passaic Valley Sewerage Commission ("PVSC"), alleging it is a "facility" and is liable as a "transporter" under CERCLA Section 107(a)(4) for the discharge of large volumes of hazardous substances into the Lower Passaic River. *See generally* ECF No. 1170 (Third Party Complaint of SPG Defendants in *OxyChem* Action against PVSC and others); *see also id.* at ¶¶ 84-114, 152-158. Many of the Defendants named in this action are customers of PVSC that used PVSC's facilities to transport process and sewer wastewater.

7.      Each Defendant named herein is a person who falls within one or more of the classes of liable persons described in Section 107(a) of CERCLA with respect to a facility from which there has been a release or threatened release of hazardous substances. Under Section 107(a), each Defendant is jointly and severally liable for response costs OxyChem has incurred or

will incur in connection with the 2023 OU4 UAO because of Defendants' disposal, arrangement for disposal, or transport for disposal of hazardous substances and their release into OU4 and the Upper Nine, as defined below.

8.      OxyChem has therefore filed this Section 107 cost recovery action to ensure that each of the Defendant parties pays the costs of response OxyChem has incurred and will incur to perform the remedial design of the OU4 interim remedy, pursuant to USEPA's March 2, 2023 UAO.

9.      On March 10, 2023, OxyChem informed USEPA that—while it disagrees that USEPA needed to issue a UAO to obtain the remedial design—OxyChem intends to comply fully with the UAO's terms. Accordingly, this action will not impact the future pace or progress of the ongoing remediation efforts.

10.     OxyChem is constrained to note, however, that ***the cleanup of OU4 would already have been well underway had USEPA accepted OxyChem's January 2022 offer to voluntarily perform the entire remedy in OU4***, rather than spurning it in favor of a wholly inadequate settlement with some (but not all) of the Defendants named herein.[2]

## II.    <u>NATURE OF THE ACTION</u>

11.     This is a civil action brought under CERCLA Section 107, 42 U.S.C. § 9607.

12.     OxyChem brings this action to recover costs incurred and that it will incur to comply with USEPA's March 2, 2023 UAO ordering OxyChem to design the OU4 Interim Remedy, as further described below.

---

[2] OxyChem reserves its right to amend this action or plead further if USEPA issues additional Unilateral Administrative Orders pertaining to the Site. OxyChem also reserves its right to plead a claim under CERCLA Section 113, 42 U.S.C. § 9613(f)(1), for costs it incurs to perform the UAO should the Third Circuit authorize parties to a UAO to file such a claim, rather than a claim for cost recovery under Section 107.

13.     Under CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), OxyChem also seeks a declaratory judgment on Defendants' liability under CERCLA Section 107(a) for response costs incurred or to be incurred in connection with USEPA's March 2, 2023 UAO, to be binding on any subsequent action or actions against Defendants for further response costs OxyChem incurs in relation to the LPRSA.

## III.    JURSDICTION AND VENUE

14.     This Court has jurisdiction over this action's subject matter and the parties pursuant to CERCLA Sections 107(a) and 9613(g)(2), 42 U.S.C. §§ 9607(a) & 9613(g)(2); 28 U.S.C. § 1331; and 28 U.S.C. §§ 2201-2202.

15.      Venue is proper in this District pursuant to CERCLA Section 113(b), 42 U.S.C. § 9613(b), and 28 U.S.C. § 1391(b), because the releases or threatened releases of hazardous substances giving rise to these claims occurred in this District, and multiple Defendants reside in this District.

16.     Pursuant to 42 U.S.C. § 9613(l), OxyChem will provide a copy of this Complaint to the Attorney General of the United States and to the USEPA Administrator.

## IV.    GENERAL ALLEGATIONS

17.     For over a century, New Jersey's Passaic River has been a heavily polluted industrial waterway. By the 1870s, it already had a shocking degree of contamination. By the turn of the last century, the Passaic River was delisted as a commercial fish source; and by 1926, the U.S. government declared the river's fish life destroyed.

18.     USEPA placed the Site on the National Priorities List in 1984.

19.     USEPA divided response actions for the Site into discrete geographic sections referred to as "Operable Units" to account for the distinct characteristics, different hydrodynamics,

and distinct sources of contamination in these areas.

20.    The Passaic River is 80 miles long. Only its lower 17 miles from below the Dundee Dam to the mouth of Newark Bay are included within the Site boundaries.

21.    Operable Unit 4 of the Site consists of the Lower Passaic River Study Area ("LPRSA"). It extends from Newark Bay at RM 0 to the Dundee Dam at approximately RM 17.7, as located in or flowing through Essex, Hudson, Passaic, and Bergen Counties to Newark Bay and its areal extent of contamination. OU4 includes the upland areas from which the hazardous substances have migrated into the Site.

22.    For convenience, as used in this Complaint, the term "Passaic River" refers only to the 17-mile reach of the Lower Passaic River from below the Dundee Dam to Newark Bay, while the term "Upper Nine" refers to the upper nine miles of the same reach of river.

23.    In 2021, based on an earlier Remedial Investigation and an Interim Remedy Feasibility Study it conducted in the LPRSA, USEPA issued a Record of Decision that calls for extensive dredging and capping in the Upper Nine in OU4 (the "OU4 Interim Remedy"). The OU4 Interim Remedy will remove and cap sediment in the Upper Nine that contains hazardous substances, at least up to RM 15. Removed sediment will be treated, and hazardous substances will be neutralized and disposed of safely. In turn, the dredged portion of the riverbed will be capped (except where dredging to native sediments occurs), isolating the remaining hazardous substances left in the riverbed sediment. The remedial design of this interim response action in OU4 is the subject of the UAO at issue here.

24.    USEPA has notified over *one hundred* potentially responsible parties ("PRPs") that they may be liable for the costs of cleaning up releases of hazardous substances in the Site.

25.     From the scores of hazardous substances in the Passaic River, USEPA has identified *eight* contaminants of concern ("COCs").

26.     USEPA sought an interim remedy for OU4 that would achieve its remediation goals for each of these eight COCs. According to USEPA, the eight COCs that drive the requirements for its selected interim remedy for the Upper Nine in OU4 are[3]:

- poly-chlorinated biphenyls ("PCBs")
- mercury
- dioxins and furans
- poly-aromatic hydrocarbons ("PAHs")
- DDx
- dieldrin
- lead
- copper

27.     USEPA determined this Interim Remedy for the Upper Nine was necessary to address the Remedial Action Objectives ("RAOs") for this operable unit of the Site. The dredging and capping selected as the OU4 Interim Remedy "would provide overall protection of human health and the environment by remediating source sediments with elevated contaminant concentrations to achieve the RAOs and accelerate the recovery of sediments, water column, and fish and crab tissue contaminant concentrations."[4]

28.     On March 2, 2023, USEPA issued the Unilateral Administrative Order for Remedial Design in the Matter of Operable Unit Four of the Diamond Alkali Superfund Site (Region 2, CERCLA Docket No. 02-2023-2011) ("2023 OU4 UAO").

---

[3] Record of Decision for an Interim Remedy in the Upper 9 Miles of the Lower Passaic River Study Area, OU4 of the Diamond Alkali Superfund Site (September 2021) ("OU4 Interim ROD") § 5.2 (Contaminants in the Upper 9 Miles), https://semspub.epa.gov/work/02/630399.pdf (last visited Mar. 6, 2023). The OU4 Interim ROD refers to DDx, i.e., DDT and its breakdown products, instead of DDT only. *Compare* Record of Decision, Lower 8.3 Miles of the Lower Passaic River Part of the Diamond Alkali Superfund Site (Mar. 3, 2016) § 5.2 (Contaminants of Concern), https://semspub.epa.gov/work/02/396055.pdf (last visited Mar. 6, 2023) (including DDT within 8 COCs).

[4] *See* OU4 Interim ROD § 10.1 (Overall Protection of Human Health and the Environment).

8

29.     Despite two centuries of pollution by hundreds of parties, USEPA ordered only OxyChem to design the OU4 Interim Remedy. USEPA estimates OxyChem will perform response work and incur response costs of approximately $71 million to comply with this UAO.[5]

30.     On March 10, 2023, after advising USEPA of its defenses as the UAO required, OxyChem notified USEPA of its intention to comply with the UAO in all respects.

31.     The Site, including the "areal extent of contamination" as designated by USEPA and the upland sources of that contamination, is a "facility" under Section 101(9) of CERCLA, 42 U.S.C. § 9601(9) (herein referred to as the "Facility").

32.     OU4 and the Upper Nine are part of the Site. OU4, the Upper Nine, and their areal extent of contamination are also a Facility under CERCLA Section 101(9)(2).

33.     There has been a "release" and/or "threatened release" of hazardous substances at, from, or into OU4 and the Upper Nine within the meaning of Sections 101(22) and 107(a) of CERCLA, 42 U.S.C. §§ 9601(22) and 9607(a). Organic and inorganic compounds detected in OU4 and the Upper Nine at elevated levels, including the 8 COCs listed in paragraph 26 above, are "hazardous substances" as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

34.     The release and/or threatened release of hazardous substances at, from, or into OU4 and the Upper Nine has caused and will continue to cause OxyChem to incur response costs, including costs for removal and/or remedial actions as defined in Section 101(23)-(25) of CERCLA, 42 U.S.C. § 9601(23)-(25), in connection with OxyChem's compliance with the 2023 OU4 UAO. The costs OxyChem has incurred and will incur are necessary to comply with the 2023 OU4 UAO and are consistent with the NCP.

---

[5] *See* OU4 Interim ROD Table 12-1 (pre-Design Investigation and Design).

35.     As described further below, each of the Defendants is liable under CERCLA as the current owner and/or operator, or past owner and/or operator at the time of disposal, of property within the Facility, from which property there have been releases or threatened releases of hazardous substances that contaminated the Passaic River. Hazardous substances disposals by the Defendants or arranged by the Defendants at and from these properties have contaminated and continue to contaminate the sediments in the LPRSA, including OU4 and the Upper Nine. Each Defendant is also liable as a transporter because it transported, or arranged to transport through the PVSC, hazardous substances for disposal into the Passaic River, including OU4 and the Upper Nine. Those hazardous substances must be removed from the riverbed and/or capped to comply with USEPA's mandated OU4 Interim Remedy.

36.     For these reasons, and those set out in greater detail below, each Defendant named herein is jointly and severally liable under CERCLA Section 107(a), 42 U.S.C. §9607(a), for the response costs OxyChem has incurred and will incur under the 2023 OU4 UAO, because of each Defendant's disposal or connection to the disposal of hazardous substances and their release or threatened release into OU4 and the Upper Nine.

## V.     PARTIES AND DEFENDANT-SPECIFIC ALLEGATIONS

37.     Plaintiff OxyChem is a New York corporation with its principal place of business at 14555 Dallas Parkway, Suite 400, Dallas, Texas.

38.     Defendant **Givaudan Fragrances Corporation ("Givaudan")**, formerly known as Givaudan-Roure Corporation, is a corporation organized under the laws of the State of Delaware with its principal place of business located at 1199 Edison Drive, Cincinnati, Ohio. From 1924 to 1998, Givaudan manufactured aromatic chemicals, flavors, fragrances, pharmaceuticals, intermediates, and pesticides at 100 Delawanna Avenue and 125 Delawanna Avenue in Clifton, New Jersey,

slightly upstream from RM 10.9 of the Passaic River. From 1947 to 1984, Givaudan manufactured hexachlorophene ("HCP") on the property and, at times, was the largest HCP maker in the world. From 1947 to 1949, Givaudan manufactured 2,4,5-TCP at the property. Givaudan's processes, including the manufacture of HCP, generated dioxins and furans, including 2,3,7,8-TCDD, as a manufacturing byproduct. In addition to generating dioxins, Givaudan maintained a chemical effluent pit near its process buildings containing mercury, lead, and copper, among other hazardous chemicals. Soil in the eastern portion of the property, including near the former chemical effluent pit and adjacent stormwater retention pond, was contaminated with 2,3,7,8-TCDD, 2,4,5-TCP, mercury, lead, copper, PAHs, DDx, and dieldrin, among other hazardous substances.

39.     Givaudan misrepresented to USEPA critical facts about its manufacturing process and its disposal paths for the release of hazardous substances to the Passaic River, creating a seriously misleading picture of Givaudan's responsibility. USEPA eventually caught on to Givaudan's actions, commissioning a study that identified Givaudan as the "Clifton Source" of dioxin contamination in the river near Givaudan's plant in Clifton. Givaudan is liable under CERCLA for the disposal of hazardous substances into OU4 and the Upper Nine.

40.     Defendant **The Sherwin-Williams Company ("Sherwin-Williams")** is a corporation organized under the laws of the State of Ohio with its principal place of business located at 101 West Prospect Avenue, Cleveland, Ohio. From 1902 until 1999, Defendant Sherwin-Williams manufactured, formulated, and blended chemical products at its plant located at 40, 60, and 62-70 Lister Avenue in Newark, New Jersey. Those products included paints, pesticides (DDT, lead arsenate, and copper arsenate), plasticizers, lacquers, resins, varnishes, and coatings. During its operations at the Lister Avenue plant, Sherwin-Williams used and generated hazardous substances including PCBs, mercury, lead, copper, DDT, and others. Sherwin-Williams also used

11

pentachlorophenol and pigments containing chloranil, both of which are Class I Pesticide Chemicals associated with the formation of dioxins. Sherwin-Williams discharged these and other hazardous substances to the Passaic River and the Upper Nine through direct discharge, PVSC discharges, and surface water runoff containing contaminated soils.

41.     Sherwin-Williams used and generated substantial volumes of PCBs at its plant and discharged those PCBs to site soils, the Passaic River and the Upper Nine. Company records show that Sherwin-Williams used thousands of pounds of PCB-containing Aroclor products on an annual basis. According to Defendant Pharmacia (f/k/a Monsanto), in 1968 Sherwin-Williams was its second largest customer of Aroclor products for use in coatings. In addition to the PCB-containing products purchased from Monsanto, published studies have reported the presence of PCBs in paints made by Sherwin-Williams.

42.     Sherwin-Williams also arranged for the disposal of hazardous substances at 310-336 Avenue P and 357-405 Avenue P in Newark, New Jersey (the "Avenue P Sites") by D & J Trucking, which resulted in contamination of the Passaic River, including the Upper Nine. Last year, the New Jersey Department of Environmental Protection ("NJDEP") sued Sherwin-Williams alleging that in 1977 a Sherwin-Williams representative confirmed the company engaged D & J Trucking to dispose of approximately 250 drums each month of waste pigments, alkyd resins, off-specification paint and waste varnish. NJDEP's complaint further alleges that documentation submitted by Sherwin-Williams to NJDEP indicates that Sherwin-Williams's waste was disposed of at the Avenue P Sites, and that land surveys of 357-405 Avenue P property conducted in the late 1960s and/or early 1970s described the site as a "paint dump" and sheds on the property were filled with containers of paints, lacquers, paint removers, varnishes, and several hundred cases of paint containers. NJDEP alleges the surveyors observed many containers affixed with Sherwin-

Williams labels. The waste disposed of at the Avenue P Sites included waste from the Sherwin-Williams plant at Lister Avenue in Newark. Liquid waste and runoff containing hazardous substances from the Avenue P Sites was discharged to Plum Creek, a tributary to the Passaic River, and eventually into the Upper Nine.

43.    Contrary to a USEPA directive, Sherwin-Williams destroyed critical documents and concealed others for decades, creating a misleading record of its extensive use of hazardous substances in its operations and its disposal of those substances to the Site, the Facility, and the Passaic River. Sherwin-Williams is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

44.    Defendant **Public Service Electric & Gas Company ("PSE&G")** is a corporation organized under the laws of the State of New Jersey with its principal place of business at 80 Park Plaza, Newark, New Jersey. Defendant PSE&G operated on several properties within the Facility that disposed of and released PAHs and other hazardous substances that have contaminated and continue to contaminate the sediments in the Passaic River.

- **The Harrison Property:** PSE&G and its predecessor entities operated for nearly 100 years on a 30-acre parcel located at 2000 Frank E. Rodgers Boulevard (the "Harrison Property"). From 1902 until 1926, PSE&G utilized the Harrison Property to store oil and manufactured gas. A gas plant began commercial operation in 1926. The gas plant originally used coal and coke as feedstock. In the 1950s, the plant used natural gas and kerosene. From 1973 to 1980, the plant used naphtha as a feedstock. Treatment techniques utilized onsite for process wastewater were ineffective, resulting in the discharge of dozens of hazardous substances to the Passaic River, including dioxins, PAHs, aromatics, inorganics, and metals. PSE&G discharged tar and oil to the Passaic River from the Harrison Property, resulting in oily discharges and an oil slick

on the Passaic River. Soil sampling at the Harrison Property indicates elevated concentrations of numerous hazardous substances. The Harrison Property has historically allowed for runoff into the Passaic River via stormwater, flooding, and surface runoff.

- **Market Street Property:** PSE&G operated at the property located at Market Street and Raymond Boulevard, Newark, New Jersey (the "Market Street Property"). From 1847 to 1954, PSE&G manufactured gas on the Market Street Property. Coal gas, water gas, and carbureted water processes were used at the Market Street Property. COCs stored, used, and/or produced by PSE&G at the Market Street Property included PAHs, lead, and mercury. Site soil contamination includes PAHs, lead, and mercury. Site groundwater contamination includes PAHs and lead. There are documented releases of hazardous substances from the Market Street Property to the Passaic River.

- **Paterson Gas Plant Property:** PSE&G operated at the property located at Wait Street in Paterson, New Jersey (the "Paterson Property"). From the mid-1860s to 1978, PSE&G produced manufactured gas at the Paterson Property. From approximately 1985 to at least 1992, PSE&G and Transcontinental Gas Pipeline Corporation operated there as a natural gas metering and regulating station. Substances stored, used, and/or produced at the Paterson Property included coal, tar, and tar pitch. Site soil contamination includes PAHs, dioxin-associated compounds, copper, lead, and mercury. Site groundwater contamination includes PAHs, dioxin-associated compounds, copper, and lead. There are documented releases of hazardous substances from the Paterson Property to the Passaic River.

- **Front Street Property:** PSE&G operated at the property located at Front Street (now McCarter Highway), between Lombardy Place and Fulton Street in Newark, New Jersey (the "Front Street Property"). From 1869 to 1937, PSE&G and its predecessors operated a manufactured gas plant at the Front Street Property. The plant used coal gas, water gas, and

carbureted water gas processes. PSE&G's operations at the Front Street Property included coal gasification and coal burning. Hazardous substances stored, used, and/or produced at the Front Street Property included PAHs and heavy metals. Site soil contamination includes PAHs, lead, copper, and mercury. Groundwater contamination includes PAHs, copper, lead, and mercury. There are documented releases of hazardous substances from the Front Street Property to the Passaic River.

- **East Newark Gas Property:** PSE&G operated at the property that was comprised of two parcels located at 419 Passaic Avenue ("Parcel 1") and 400-404 Passaic Avenue ("Parcel 2") in Newark, New Jersey ("East Newark Property"). From 1872 to 1890, coal gas was manufactured on the East Newark Property. It was used as a gas holder facility until approximately 1906. COCs stored, used, and/or produced by PSE&G at the East Newark Property included PAHs, mercury, copper, and lead. There are documented discharges of hazardous substances from the East Newark Property to the Passaic River.

- **Former City Dock Substation Property:** PSE&G operated at the property located at River Street and City Dock Street in Newark, New Jersey (the "Substation Property"). COCs stored, used, and/or produced at the Substation Property included mercury, dielectric fluids containing PCBs, and lead-acid batteries. Site soil contamination includes several types of PAHs, PCBs, lead, copper, and mercury. Site groundwater contamination includes dioxin-associated compounds and PAHs. There are documented discharges of hazardous substances from the Substation Property to the Passaic River.

- **Coal Street Generator Station Property:** PSE&G operated at the property located at McCarter Highway and Center Street in Newark, New Jersey (the "Coal Street Property"). COCs stored, used, and/or produced at the Coal Street Property included copper, lead, PCBs, and

PAHs. Site soil contamination includes PAHs, PCBs, lead, and copper. Site groundwater contamination includes lead and mercury. There are documented discharges of hazardous substances from the Coal Street Property to the Passaic River.

- **Essex Property:** From 1915 to the present, PSE&G and its subsidiaries have owned and operated an electricity-generating station located at 155 Raymond Boulevard, Newark, New Jersey (the "Essex Property"). The Essex Property has generated combustion gases, coal bottom ash, fly ash, coal storage runoff, waste oil, filter press waste, natural gas scrubber waste, transil oil, noncontact cooling water, boiler blowdown, LP boiler cleaning residuals, HP boiler cleaning residuals, soot, carbon black, condenser cleanings, feedwater heater cleanings, and air heater/fireside wash water. The Essex Property is contaminated with mercury, PCBs, dioxin-associated compounds, copper, lead, and PAHs. Additionally, there have been numerous instances of spills of hazardous substances at the Essex Property to either the discharge canal or the Passaic River itself, including spills of fire suppression runoff from the electrical switching facility and various oils associated with dielectric fluids.

45.     PSE&G is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

46.     Defendant **Nokia of America Corporation ("Nokia")**, formerly known as Alcatel-Lucent USA, Inc., is a corporation organized under the laws of the State of Delaware with its principal place of business at 600-700 Mountain Avenue, Suite 700, New Providence, New Jersey. Nokia, a successor to Western Electric Company, Inc. ("Western Electric"), owned and operated a 147-acre property located at 100 Central Avenue, Kearny, New Jersey, also designated as Block 288, Lot 10.01 on the tax maps of Kearny, Hudson County. Western Electric manufactured electromechanical and telecommunications equipment, including switchboards, wiring, and

16

mercury relays and transformers at this property from 1925 to 1984. After 1929, Western Electric used PCBs as a coating and as lubricants in its electromechanical equipment. Nokia and/or its predecessors also operated a powerhouse on the property. Western Electric had at least 13 active and inactive PCB transformers on the property, including two stored outdoors without adequate roofing, walls or proper diking. Other hazardous substances utilized at the property included mercury, copper, lead, and compounds containing PAHs. Nokia is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

47.     Defendant **Pharmacia LLC ("Pharmacia"**), formerly known as Monsanto Company, is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 7000 Portage Road, Kalamazoo, Michigan. From approximately 1954 until 1994, Defendant Pharmacia owned and operated a chemical manufacturing facility at the foot of Pennsylvania Avenue in Kearny, New Jersey, abutting the Passaic River. Pharmacia used hazardous substances at its property including PCBs, mercury, copper, lead, and compounds containing PAHs. From 1929 to 1977, Pharmacia and its predecessor Monsanto were responsible for 99% or more of all PCBs sold in the United States. PCBs are highly toxic and some—called dioxin-like PCBs—mimic dioxins in their effects on human and aquatic health. PCBs also persist in the environment and do not break down over time, making them a long-term environmental hazard.

48.     Just last year, NJDEP sued Pharmacia alleging that, over a period of fifty years, it had caused "significant, long-term damage" to the state's waterways and groundwater, as well as to soil, air, and wildlife by disposing of PCB waste into sewers. NJDEP alleges that Pharmacia and its predecessors "misled the public, regulators, and its own customers … maintaining that its PCB formulations were safe, were not environmentally hazardous, and did not require any special

17

precautions for use or disposal." According to NJDEP's complaint, as long ago as 1969, Monsanto—Pharmacia's predecessor—acknowledged the serious risks of PCBs to health and the environment, writing that there was "little probability that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls…as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of marine species (shrimp), and the possible extinction of several species of fish-eating birds." Even so, NJDEP alleges Monsanto sought to prolong the use of its franchise brand name, Aroclor, writing in another memo that "there is too much customer/market need and selfishly too much Monsanto profit to go out."

49.    During Pharmacia's ownership and operation of this property, it disposed of hazardous substances on the property and directly into the Passaic River. Pharmacia also had numerous pits and ponds that it used to dispose of highly concentrated PCB mixtures near the river. Pharmacia also used PCBs as a non-contact heat-transfer fluid in production equipment, which were drained into unlined trenches and disposal areas. Soils on the property are also contaminated with PCBs, dioxin-associated compounds, mercury, copper, lead, and PAHs. PCBs have moved through property's drainage system, groundwater, and soil toward the river. Pharmacia is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

50.    Defendant **Ashland LLC ("Ashland")**, formerly known as Ashland Chemical Company, is a limited liability company organized under the laws of the State of Kentucky with its principal place of business located at 50 East River Center Boulevard, Covington, Kentucky. Ashland operated the property located at 1106 Harrison Avenue in Kearny, New Jersey (the "Drew Chemical Corporation Property") from approximately 1970 to at least 2010. Ashland is the

successor in interest to Drew Chemical Corporation. Drew Chemical Corporation's 1992 Community Right to Know survey lists 314 pages of hazardous substances and chemicals as being used or produced onsite. COCs stored, used, and/or produced at the Drew Chemical Corporation Property included dioxins and dioxin-associated compounds, PAHs, PCBs, copper, lead, and mercury. Site soil contamination includes PAHs, PCBs, copper, lead, mercury, volatile organic compounds, and semi-volatile organic compounds, dioxin-associated compounds, and dieldrin. Based on information compiled to date, dioxins and dioxin-associated compounds associated with the Site have been identified in local area soil and sediments. Site effluent contamination includes copper, lead, and volatile organic compounds. Ashland failed to disclose these facts to USEPA in response to a 104(e) request, creating a misleading picture of its liability for the disposal of hazardous substances.

51.     From 1968 until 1990, Ashland or its predecessors also operated the property located at 221 Foundry Street, Newark, New Jersey (the "Foundry Property"). Here, Ashland or its predecessors received, stored, and repackaged aliphatic and aromatic hydrocarbons, acids, alcohols, amines, esters, ethers, glycols, halogenated solvents, ketones, and nitroparaffins. Ashland generated waste oils, spill cleanup material, and "hose residue." There are documented discharges of hazardous substances from the Foundry Property. For these reasons, Ashland is liable under CERCLA for the disposal of hazardous substances from the Drew Chemical facility and the Foundry Property to OU4 and the Upper Nine.

52.     Defendant **Clean Earth of North Jersey, Inc. ("Clean Earth")** is a corporation organized under the laws of the State of New Jersey with its principal place of business at 115 Jacobus Avenue, Kearny, New Jersey. Clean Earth has operated on two properties along Jacobus Avenue. From 1972 to 1984, Clean Earth and its predecessor operated on property at 109-113

Jacobus Avenue, which is currently owned by Melon Leasing Corporation, Inc. Clean Earth continues to lease the property at 109 – 113 Jacobus Ave. Sewer lines connected the Clean Earth operations at 109-113 Jacobus Avenue to the Passaic River, carrying hazardous substances from Clean Earth to the river. Clean Earth and its predecessors have operated and continue to operate on a property located at 101-115 Jacobus Avenue, Kearny, New Jersey. Clean Earth is the current partial owner of several parcels on the 101-115 Jacobus Avenue property and has operated it since 1984. Specifically, the parcels located at 101-105 Jacobus Avenue are owned by Clean Earth; and the parcel at 115 Jacobus Avenue serves as Clean Earth's offices and onsite laboratory. Clean Earth is the ultimate successor via mergers and name changes involving S&W Waste, Inc. From 1972 to the present, Clean Earth and its predecessors provided hazardous and nonhazardous waste treatment and disposal for third parties at the properties.

53.     According to a 1988 Resource Conservation and Recovery Act ("RCRA") facility investigation report, which was necessitated by documented discharges to soil on the 101-115 Jacobus Avenue property, Clean Earth was required to prepare an assessment plan proposal report that would include a groundwater monitoring and soil sampling program. In 1990, NJDEP confirmed the presence of dioxins in soil samples. Two 2,000-gallon underground storage tanks were removed from the 101-115 Jacobus Avenue property in 1990. Also in 1990, Clean Earth was required by NJDEP to perform a remedial investigation. In 1992, Clean Earth prepared a modified remedial investigation work plan. Twenty-eight soil samples were taken, and eleven areas of concern were identified. Groundwater generally flows west toward the Passaic River. A nexus exists between the 101-115 Jacobus Avenue property and the Passaic River via groundwater flow. Regarding runoff, the 101-115 Jacobus Avenue property is bordered to the west by the Passaic River, and potentially contaminated stormwater has been observed overflowing containment

berms at the property on more than one occasion. Clean Earth is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

54.     Defendant **TFCF America, Inc. ("TFCF")**, formerly known as 21st Century Fox America, Inc., News America, Inc., Montrose Chemical Company ("Montrose"), and Chris Craft Industries, is a corporation organized under the laws of the State of Delaware with its principal place of business at 1211 Avenue of the Americas, New York, New York. TFCF, through its predecessor, Montrose, operated a manufacturing plant at 100/120 Lister Avenue in Newark from 1939 to 1972 at which it manufactured many organic chemicals, herbicides, and pesticides, including up to 3 million pounds of DDT per year. Montrose manufactured 2,4-D and 2,4,5-T at the property and likely generated dioxins and furans as a byproduct of these processes. It also manufactured several dioxin-associated chemicals including, among other chemicals, the gamma isomer of benzene hexachloride (lindane), hexachlorobenzene, trichlorobenzene, propanil, and likely tetrachlorobenzene. Dioxin-associated compounds, including dichlorobenzenes, dichlorophenol, phthalic anhydride, and pentachlorophenol, were used in and/or produced by processes at the property. Montrose also produced several types of phthalate compounds including bis(2-ethylhexyl) phthalate, butyl phthalate, dimethyl phthalate, and dioctyl phthalate. Metals like lead and copper were likely discharged with property wastewater as a result of corrosion of site process equipment. Defendant TFCF is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

55.     Defendant **Alden Leeds Inc. ("Alden Leeds")** is a corporation organized under the laws of the State of New York with its principal place of business at 55 Jacobus Avenue, South Kearny, New Jersey. Alden Leeds has operated at 55 Jacobus Ave., South Kearny, New Jersey since before 1972 until ending production in June 1999. Alden Leeds' operations included the

manufacture of plastic bottles, which were then filled with household strength bleach or ammonia, with principal raw materials including sodium hypochlorite and ammonium hydroxide. Alden Leeds' discharge, which included copper and other hazardous substances, was bypassed to the Passaic River from the beginning of its operations at the property until February 28, 1975, with no federal permit. Defendant Alden Leeds is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

56.     Defendant **Alliance Chemical Inc. ("Alliance Chemical")** is a corporation organized under the laws of the State of Maryland with its registered agent at Gordon Rees Scully Mansukhani 18 Columbia Turnpike, Suite 220, Florham Park, NJ. Alliance Chemical filed Articles of Dissolution with the Secretary of State of Maryland in 2021. Alliance Chemical or its predecessors owned or operated the property at 33 Avenue P, Newark, New Jersey from at least 1946 until 2001. From at least 1946 until 2001, Alliance Chemical manufactured specialty organic chemicals including intermediates for the textile and photographic industries, dye and pigment intermediates, and diazo and zinc compounds. Alliance Chemical's dye production is associated with dioxins, furans, dioxin-associated compounds, PCBs, copper, and mercury. Alliance Chemical has been listed by USEPA as a producer of Class II dioxin-associated organic chemicals. Soil and groundwater sampling at the property indicates the presence of dozens of hazardous substances, including mercury, copper, lead, and other metals; PCBs; chlorobenzene; xylenes; DDx; and numerous dioxin-associated compounds. Defendant Alliance Chemical is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

57.     Defendant **BASF Corporation ("BASF")** is a corporation organized under the laws of the State of Delaware with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey. United Cork Companies was BASF's predecessor in interest and operated the 27-

acre chemical manufacturing facility at 50 Central Avenue, Kearny, New Jersey from 1935 to 1964. United Cork Companies manufactured insulation and dyestuffs at the property from 1935 to 1964. From 1964 until 1990, BASF operated the property. BASF formulated and manufactured chemical products, chemical intermediaries, plasticizers, and dyes at the property. The main material manufactured by BASF was phthalic anhydride, which is associated with the formation of dioxins. BASF also used other dioxin-associated compounds on the property, including maleic anhydride, chloranil, and benzaldehyde. BASF and its predecessors also owned and operated 150 Wagaraw Road, Hawthorne, New Jersey from 1946 to 1986. Historically, textile pigment dispersions, dyestuffs, pigments, and dyes were manufactured at the property, and BASF continued the same operations and also manufactured specialty polymers and chemicals. BASF utilized dioxin-associated compounds, and the filter tanks used to filter Passaic River water for cooling purposes contained various dioxins and furans. COCs stored, used, and/or produced at the property included mercury, dioxin-associated compounds, copper, lead, PCBs, and PAHs. Soil contamination includes mercury, dioxin-associated compounds, dieldrin, PAHs, PCBs, copper, and lead. There are documented discharges of hazardous substances from the property to the Passaic River. Additionally, nitrobenzene leaked from a tank farm, and nitrobenzene, aniline, and other base neutral compounds were then found in the groundwater below the property. Groundwater flow at the property is in the direction of the Passaic River. BASF is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

58.     Defendant **Bath Iron Works Corporation ("BIW")** is a corporation organized under the laws of the State of Maine with its principal place of business at 700 Washington Street, Bath, Maine. Defendant BIW is formerly known as and/or is the successor to Congoleum Corporation ("Congoleum/BIW"). BIW, through its predecessor Congoleum Corporation,

operated at a property located at 195 Belgrove Drive, Kearny, New Jersey. From approximately 1886 to 1974, Congoleum/BIW owned and operated a flooring manufacturing facility at the property and manufactured linoleum and/or vinyl floorings, wall coverings, and desk tops, and related pastes, waxes, and adhesives. During World War II, Congoleum/BIW also manufactured materials for military use, including aerial torpedo parts and grenades, battleship linoleum, mildew-proof sandbags, tent cloth, camouflage netting, and synthetic leather. Hazardous substances stored, used, manufactured, and/or disposed of at this property included PCBs, mercury, lead, copper, and PAHs. Congoleum/BIW utilized PCBs in plasticizers, lubricants, and in heat exchange equipment and transformers, used mercury as an antibacterial agent in its adhesives, and used lead and copper in dyes and paint. Soils on the property are significantly contaminated with hazardous substances including dioxin-associated compounds, DDT, PAHs, PCBs, copper, lead, and mercury. Groundwater at this site is also contaminated with dioxin-associated compounds, PAHs, PCBs, copper, lead, and mercury. BIW directly discharged hazardous substances from this property to the Passaic River. BIW is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

59.     Defendant **Benjamin Moore & Co. ("Benjamin Moore")** is a corporation organized under the laws of the State of New Jersey with its principal place of business at 101 Paragon Drive, Montvale, New Jersey. Defendant Benjamin Moore has owned and operated a paint and resin manufacturing facility at 134 Lister Avenue, located at RM 3.4 on the waterfront of the Passaic since 1925. During Benjamin Moore's ownership of the property, hazardous substances were disposed of in the Passaic River and the Upper Nine. Mercury, copper, lead, PAHs, PCBs, and dioxin-associated compounds have been detected in soils on the property. Stormwater flowed

through contaminated areas on the property and discharged to the Passaic River and the Upper Nine via runoff during wet weather.

60.     For several years in the 1970s, Benjamin Moore arranged for the disposal of hazardous substances at 310-336 Avenue P and 357-405 Avenue P (the "Avenue P Sites") in Newark, New Jersey by D & J Trucking, which resulted in contamination of the Passaic River and the Upper Nine.

61.     Last year, NJDEP sued Benjamin Moore alleging that in 1977 Benjamin Moore confirmed to NJDEP that the company engaged D & J Trucking to dispose of waste, including waste pigments and alkyd resins. NJDEP's complaint further alleges that land surveys of the sites conducted in the late 1960s and/or early 1970s described the site at 357-405 Avenue P as a "paint dump," with various sheds containing containers of paints, lacquers, paint removers and varnishes, and several hundred cases of paint containers. NJDEP alleges that the surveyors observed many containers affixed with Benjamin Moore labels. D & J Trucking also used the property at 310-336 Avenue P to dump hazardous substances and other compounds, including, but not limited to, liquid waste (such as paint waste, tank washings, and still bottoms) from the Benjamin Moore operations at 134 Lister Avenue, Newark, New Jersey. During D & J Trucking's use of the property, it dumped liquid waste (including paint pigments) from vacuum trucks and drums directly onto the property and into unlined pits on the property. Liquid waste and stormwater flowed through contaminated areas on the Avenue P Sites and discharged to Plum Creek, a tributary to the Passaic River, and eventually to the Upper Nine. Benjamin Moore is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

62.     Defendant **CNA Holdings LLC ("Celanese")** is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 222 W. Las

Colinas Boulevard, Suite 900, Irving, Texas. Defendant Celanese operated the property at 354 and 375 Doremus Avenue in Newark, New Jersey from 1954 until 1996. There, Celanese operated a chemical bulk storage and distribution business. Hazardous substances were shipped to the Celanese property via ship, railroad car, and tanker truck for redistribution to customers. Upon receipt, the hazardous substances were offloaded to aboveground storage tanks by aboveground pipes and a pipe tunnel and bridge spanning Doremus Avenue. The property borders Plum Creek (a tributary of the Passaic River), and there is a nexus from the property to Plum Creek. There are documented discharges of hazardous substances from the property to the Passaic River. COCs detected in Plum Creek's sediment include dieldrin, DDx, PAHs, PCBs, copper, lead, and mercury. Celanese is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

63.     Defendant **Conopco, Inc. d/b/a Unilever Best Foods North America ("Unilever"),** formerly known as Bestfoods Corporation, CPC International, Inc., Corn Productions Corporation, and S.B. Penick Company, is a corporation organized under the laws of the State of New York with its principal place of business at 700 Sylvan Avenue, Englewood Cliffs, New Jersey. Defendant Unilever, as the successor to the S. B. Penick Company, owned and operated a 17-acre property located at 540 New York Avenue in Lyndhurst, New Jersey from 1938 to 1986. The plant at the property manufactured pharmaceuticals and pesticides, including DDT and products containing mercury, lead, and copper. Sampling performed in July 1984 indicated that the property's soil was contaminated with lindane, DDT, DDE, DDD, chlordane, α-BHC, b-BHC, aldrin, heptachlor, and dieldrin. Unilever used PCBs in its transformers and process equipment. Process wastes, including PCBs, mercury, lead, copper, and PAHs, were discharged by Unilever to the Passaic River via the

storm sewer. Unilever is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

64.     Defendant **Cooper Industries, LLC ("Cooper")**, formerly known as Cooper Industries, Inc., and McGraw-Edison, is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 600 Travis Street, Suite 5800, Houston, Texas. Cooper, a subsidiary of Eaton Corporation, and its predecessors owned and operated a battery manufacturing and storage facility at 75 Belmont Avenue, Belleville, New Jersey from at least 1889 to 1985. Cooper used mercury at the property to manufacture zinc-air and copper-oxide batteries. Cooper also used PCBs, lead, copper, and PAH-containing compounds in its operations. Until 1916 Cooper disposed of waste into a brook behind the plant, and after 1916 both to the brook and to the Belleville sewer line. Both flowed directly to the Second River then to the Passaic River until the PVSC treatment plant diverted some of the flow through the Belleville sewer lines to its facility for treatment. Overflow discharges bypassed the PVSC treatment facility and discharged directly to the Second River, and on to the Passaic River. Releases of hazardous substances from the property have contaminated and continue to contaminate the sediments in the Passaic River. Cooper is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

65.     Defendant **EnPro Industries, Inc. ("EnPro"), formerly Crucible Steel ("Crucible"),** also formerly known as Colt Industries, Inc. and Coltec Industries, Inc., is a corporation organized under the laws of the State of North Carolina with its principal place of business at 5605 Carnegie Boulevard, Suite 500, Charlotte, North Carolina. EnPro, through its predecessor Crucible, operated a steel manufacturing and arms production facility located at 900-1000 South Fourth

Street, Harrison, New Jersey from 1900 to 1973. At the height of its arms manufacturing operations the facility encompassed 63 acres on the banks of the Passaic River.

66.     From 1900 to 1947, EnPro's "Atha Works" steel and arms manufacturing operations used and discharged hazardous substances, including PCBs, mercury, lead, copper, and PAHs. At the Atha Works facility EnPro used copper in the production of copper alloys and specialty metals, and lead in the lead quenching baths used in the steel production process. EnPro utilized mercury in its production of artillery, detonators, bombs, armor-piercing projectiles, or other explosives. PAHs entered the environment as a result of EnPro's use of coal and coke in its production of steel. After 1929 EnPro used PCBs in the transformers and heat exchange equipment necessary to power and control the high temperatures necessary for steel production, as well as the melting and casting of large metal ingots into 16-inch cannons and heavy battleship artillery. EnPro directly discharged PCBs, mercury, lead, copper, and PAHs to the Lower Passaic River through an extensive system of underground pipes. This drainage system underpinned the entire 63-acre site and consisted of surface-level manholes that drained into 16,588 feet of lateral pipes, which fed into a main pipe, 6 to 8 feet in diameter. The main discharged directly into the Passaic River through a 6 by 6-foot box culvert outfall. In 1947 EnPro reorganized its operations due to reduced demand for arms production. EnPro sold and leased portions of the property to other entities, discontinued its "Atha Works" operations, and relocated its "Spaulding Works" steel mill operations to a 14-acre portion of the site. EnPro's Spaulding Works continued steel manufacturing operations until 1973. Site soil contamination across the 63-acre site includes high concentrations of PCBs on the former dock area next to the Passaic River; elevated concentrations of mercury in various areas of the site, specifically near the former shell shops, bomb assembly and bomb heat-treating buildings, and in vitrified clay drainpipes; and ubiquitous elevated concentrations of lead,

copper, and PAH contamination. Site groundwater contamination includes PCBs, mercury, lead, copper, and PAHs.

67.      Defendant **Teval Corporation ("Teval"),** formerly named Guyon General Piping, Inc., and Charles F. Guyon, Inc., is a corporation organized under the laws of the State of New York with its principal place of business at 1 Portland Square, Portland, Maine. In 1947, Teval purchased 38 acres of the EnPro facility at 900-1000 South Fourth Street, Harrison, New Jersey, and began pipe manufacturing operations. In 1967 Teval purchased another 7 acres of the property from EnPro. Teval used and discharged hazardous substances during its operations, and leased portions of the site to other entities that used and discharged hazardous substances, including PCBs, mercury, lead, copper, and PAHs. In 1970, PVSC filed a complaint against EnPro and Teval for the continuous discharge of oily waste directly into the Passaic River through the 6-foot-diameter main discharge pipe. It was determined that a source of the oily discharge was the Guyon No. 1"lateral pipe.

68.      EnPro and Teval used PCBs, mercury, lead, copper, and PAHs in their operations, and discharged those hazardous substances to the Passaic River through multiple pathways. Waste, waste water, and storm water containing hazardous substances entered the extensive underground sewer system through manholes and storm sewer openings, flowed to the 6-foot-diameter discharge main, and then flowed directly into the Passaic River. Hazardous substances from EnPro's and Teval's operations also entered the Passaic River via stormwater overflows in the municipal sewer system, and via rainwater runoff and soil.

69.      Site soil and groundwater contamination across the EnPro and Teval property includes PCBs, mercury, lead, copper, and PAHs. Groundwater at the property is hydraulically

connected to the Passaic River and hazardous substances in the property's soil and groundwater discharged to the Passaic River and the Upper Nine via groundwater migration.

70.      EnPro and Teval are liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

71.      Defendant **General Electric Company ("General Electric")**, formerly known as Radio Corporation of America ("RCA"), The Edison General Electric Company, and the Edison Lamp Company, is a corporation organized under the laws of the State of New York with its principal place of business at 41 Farnsworth Street, Boston, Massachusetts. RCA was founded by General Electric in 1919, became independent of General Electric in 1932, and was reacquired by General Electric in 1986. General Electric is the successor to RCA.

72.      General Electric owned and operated two manufacturing facilities in Harrison, New Jersey, located at 415 South 5th Street ("5th Street Site") and 1000 South 2nd Street ("2nd Street Site") both of which are within the Facility. General Electric owned and operated the 5th Street Site from 1882 until 1976. From 1882 until 1929, the 5th Street Site manufactured incandescent lamps and vacuum tubes as The Edison Lamp Company. RCA acquired the 12.5-acre facility in 1930 and manufactured vacuum tubes for use in radios, military communication devices, and televisions. Incandescent lamp production involved the hazardous substances lead (in lead glass), copper (in copper-plated wiring), and mercury for use in Edison's "all-mercury combination vacuum pump," which required filling and emptying several reservoirs and receptacles with mercury. Mercury, lead, and copper were used in RCA's production of vacuum tubes. After 1929, PCBs were used in transformers at the site. Available records show that RCA Harrison purchased 1,850 pounds of the PCB Aroclor 1254 from 1958 to 1963. Hydraulic oil containing PAHs was also used at the site. Site soil contamination at the 5th Street Site includes PCBs, mercury, lead,

copper, and PAHs. Site groundwater contamination includes PCBs, mercury, lead, copper, and PAHs.

73.     From 1882 until its connection to the PVSC sewer system in 1924, General Electric discharged waste and wastewater containing mercury, lead, copper, and PAHs into documented floor drains and catch basins leading to the sewer system, which discharged untreated waste to the Passaic River. After its connection to PVSC the 5th Street Site was served by the Bergen Street CSO, which discharged overflow sewage containing PCBs, mercury, lead, copper, and PAHs from General Electric's 5th Street Site directly to the Passaic River. RCA began vacuum tube production at the 2nd Street Site in 1950, and utilized PCBs, mercury, lead, copper, and PAHs. The 2nd Street Site had a stormwater sewer system that discharged directly to the Passaic River. Hazardous substances also entered the Passaic River from both General Electric sites via stormwater runoff, erosion of contaminated sediments, and groundwater migration.

74.     For all these reasons, General Electric is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

75.     Defendant **Hexcel Corporation ("Hexcel"),** formerly known as Fine Organics, Inc., is a corporation organized under the laws of the State of Delaware with its principal place of business at 281 Tresser Boulevard, Two Stamford Plaza, 16th Floor, Stamford, Connecticut. Hexcel and its predecessors have owned and operated 205 Main Street, Lodi, New Jersey since 1944. During the period of 1944 to 1981, Hexcel operated both a fine chemical manufacturing operation and an industrial maintenance chemicals operation at the property. After 1981, Hexcel manufactured industrial alkaline, water-based cleaners, paint strippers, deodorant/air freshener soap blocks, dibactol, and oxalic/phosphoric acid liquid cleaners. Hexcel also made resins until 1986, which consisted of polyurethane prepolymers and curatives. Hexcel used oil containing PCBs in a boiler

31

room that contaminated the surrounding site soil and the industrial sewer line in high concentrations. Hexcel discharged process wastes, including hazardous substances, to the Saddle River and ultimately to the Passaic River. The industrial sewer discharged directly to the Saddle River during stormwater overflows. A storm sewer on Hexcel's site discharged to Saddle Brook, which flows into the Saddle River and into the Passaic River. Site soil contamination at the Hexcel property includes PCBs, mercury, and PAHs, which entered Saddle Brook, the Saddle River, and the Passaic River through soil erosion and rainwater runoff. Hexcel is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

76.     Defendant **ISP Chemicals LLC ("ISP"),** formerly known as International Specialty Products, Inc. and ISP Van Dyk, Inc. is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 1361 Alps Road, Wayne, New Jersey. Defendant ISP and its predecessors have owned and operated 11 William Street, Belleville, New Jersey from 1943 until the present. The Passaic River is approximately 250 feet east-southeast of the property. ISP manufactured specialty chemicals for the cosmetic and personal care industry, including a main component in sunscreens (ultraviolet absorbers), emulsifiers, and emollients. ISP used several hazardous substances on the property including PCBs, mercury, and copper. ISP used PCB-containing heating oil throughout the site in oil lines to operate the hot oil heating system prior to 1979. ISP disposed of hazardous substances on the property. For example, contaminants were discharged onto the property and to the Passaic River during a 1948 pipe removal and a 1977 sewer line blockage. Process waste and sanitary waste from the property were discharged to PVSC. Multiple incidents with storm sewers, leaks, and overflows caused hazardous substances from ISP to enter the Passaic River during operations of the plant by ISP or its predecessors. ISP is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

77.     Defendant **Kearny Smelting & Refining Corp. ("Kearny Smelting")** is a corporation organized under the laws of the State of New York with its principal place of business at 936 Harrison Avenue, Kearny, New Jersey. Defendant Kearny Smelting operated at 936 Harrison Avenue, Kearny, New Jersey from 1946 to 2009. Kearny Smelting's operations at the property included scrap metal smelting and scrapping of brass and bronze. COCs stored, used, and/or produced at the property included oil containing PCBs, copper, lead, and compounds containing PAHs. Site soil contamination includes concentrations of PCBs up to 46,400 mg/kg. Mercury, lead, copper, and PAHs have also been found at elevated concentrations in site soil. Site groundwater contamination at the property includes PAHs, lead, copper, and mercury, and property surface water is contaminated with copper, lead, and mercury. These hazardous substances entered the Passaic River via stormwater runoff, erosion of contaminated sediments, and groundwater migration from the Kearny Smelting site to Frank's Creek, which flows into the Passaic River. Moreover, copper, lead, and mercury were also detected in sediment on the property. Kearny Smelting is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

78.     Defendant **Legacy Vulcan, LLC (f/k/a Vulcan Materials Company; f/k/a Kolker Chemical Corporation) ("Vulcan")** is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 1200 Urban Center Drive, Birmingham, Alabama.

79.     Defendant **McKesson Corporation ("McKesson")** is a corporation organized under the laws of the State of Maryland with its principal place of business at One Post Street, San Francisco, California. Defendant McKesson sold McKesson Envirosystems to Safety-Kleen Corp. in 1987.

80.     Defendant **Safety-Kleen Envirosystems Company ("Safety-Kleen")** is a corporation organized under the laws of the State of California with its principal place of business at 42 Longwater Drive, Norwell, Massachusetts.

81.     The chemical manufacturing facility located at 600 Doremus Avenue Newark was operated by Defendants Vulcan, McKesson and/or Safety-Kleen from 1952 through at least 1987.

82.     From 1952 until 1975, Vulcan operated chemical manufacturing operations at 600 Doremus Avenue in Newark, New Jersey, which consisted of approximately 9.5 acres of waterfront land along the Passaic River near RM 0 to RM 0.5. Vulcan's operations at the property used or manufactured hazardous substances, including PCBs, lead, copper, pentachlorophenol (a compound associated with dioxins), and others. Vulcan purchased PCB-containing Aroclor mixtures from Monsanto and used those PCBs for the extensive system of transformers and other electrical equipment needed for its chlor-alkali operation. As alleged by NJDEP, Monsanto instructed its customers to drain PCB fluids from electrical equipment into sewers, and all sewers and trenches at Vulcan's property discharged directly to the Passaic River and the Upper Nine. Soil and groundwater sampling at the site confirmed the property was heavily contaminated with numerous hazardous substances, including PCBs, mercury, lead, copper, PAHs, pentachlorophenol, and other hazardous substances associated with the formation of dioxins. Vulcan's operations at the property discharged effluent, wastewater, cooling water, and site runoff through trenches and sewers at the site leading directly into the river. On a weekly basis, Vulcan cleaned its chlor-alkali cells containing lead, copper, and PAH-associated compounds by flushing their contents directly into the river. Vulcan's discharges into the Lower Passaic River were so extensive that plant employees referred to the Passaic River as the "Save-All Tank." Vulcan is liable under CERCLA for the disposal of these hazardous substances to OU4 and the Upper Nine.

83.     Defendant Vulcan sold the plant to Defendant McKesson in 1974, but Vulcan continued to conduct chemical manufacturing operations at the property until 1981. During this period, Vulcan continued to discharge hazardous substances from those operations directly into the Passaic River and the Upper Nine. Both Defendant McKesson (as the owner) and Defendant Vulcan (as the operator) are liable under CERCLA for the disposals of hazardous substances to OU4 and the Upper Nine by Vulcan during and after this period.

84.     After a 1981 merger, McKesson and/or McKesson Envirosystems and/or Safety-Kleen owned and continued to operate the property as a hazardous waste treatment facility. As of 1982, McKesson was processing numerous chemicals at the property, including acetone, dimethyl aniline, methylene chloride, and mixed chlorinated hydrocarbons. In October 1982, there was an explosion and fire on the property during the processing of waste dimethyl sulfoxide, and NJDEP ordered the plant closed immediately. Soil and groundwater sampling at the property detected many hazardous substances, including PCBs, mercury, lead, and others. Defendants McKesson and Safety-Kleen are liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

85.     Defendant **Neu Holdings U.S. Corporation ("Neu Holdings")** is a corporation organized under the laws of the State of Delaware with its principal place of business at 47 Parsippany Road, Whippany, New Jersey. Defendant Neu Holdings and its predecessors owned and operated a property located at 1 Ackerman Avenue in Clifton, New Jersey from 1930 to late 1986. The property is bordered on the east by the Passaic River. This property is part of the Facility. Neu Holdings and its predecessors manufactured container board, box board, and roofing felt and shingles. Neu Holdings used hazardous substances in its operations, including PCBs, mercury, lead, copper, and PAHs. NJDEP reports that the soil in the drum storage area on the property is

contaminated with mercury, lead, copper, and PAHs, and that the soil in the transformer area on the property is contaminated with PCBs. There are documented releases of hazardous substances from the property to OU4 and the Upper Nine, rendering Neu Holdings liable under CERCLA for those disposals.

86.     Defendant **Noveon Hilton Davis, a subsidiary of Dystar LP ("Noveon Hilton Davis")** is a corporation organized under the laws of the State of Delaware with its principal place of business at 2235 Langdon Farm Road, Cincinnati, Ohio.

87.     Defendant **STWB Inc. (f/k/a Sterling Winthrop, Inc./Sterling Drug) ("STWB")** is a Delaware corporation with its principal place of business at 800 N. Lindbergh Blvd., St. Louis, Missouri.

88.     Defendants Noveon Hilton Davis and STWB, at various times, owned and operated the Thomasset/Hilton Davis chemical business at the property located at 104-112 Lister Avenue (also referenced as 120 Lister Avenue) in Newark, New Jersey (which is also designated as Block 2438, Lot 56 on the tax map of the City of Newark) from 1955 until 1997. Operations at the property included production of phthalocyanine colors (phthalocyanine blue and phthalocyanine green) for the automotive industry, transoxides for the textile industry, and D&C colors for the drug and cosmetic industry. Property operations also included production of 2,4,2-Schaeffer salt (2-naphthol-6-sulfonic acid), fluorescein dyes, and brominated fluorescein pulps. The phthalocyanine blue process utilized copper, cuprous and cupric chloride, and phthalic anhydride (a Class III Organic Chemical associated with the formation of dioxins) in the manufacturing process and trichlorobenzene (1,2,4-trichlorobenzene is a USEPA Class III Organic Chemical associated with the formation of dioxins) in the finishing process. PCB formation is also associated with phthalocyanine blue production, depending on the raw materials and process used. Operations

at the site, at various times, discharged process wastes directly to the Passaic River. Stormwater from the site flowed towards the Passaic River and carried with it contaminants located in site soils and chemical storage areas. Defendants Noveon Hilton Davis and STWB are liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

89.    Defendant **Paramount Global ("Paramount")**, formerly known as ViacomCBS, CBS Corporation, Viacom Inc. and Westinghouse Electric Corporation, is a corporation organized under the laws of the State of Delaware with its principal place of business at 51 W. 52nd Street, New York, New York. Paramount operated on a property at 95 Orange Street, Newark, New Jersey from 1893 to 1983. This property is part of the Facility. Westinghouse owned and operated a relay instrument and electrical equipment manufacturing facility at the property. Westinghouse fabricated parts and assembled relays and instruments. Operations at the property used PCBs including Pyranol A, copper, lead, and cutting-oil waste. Site soil and groundwater contamination includes PCBs, mercury, lead, copper, and PAHs. From 1893 to 1924, prior to PVSC's sewer system completion, wastewater discharges from the property directly discharged to the Passaic River. After its connection to PVSC wastewater from the property bypassed to the Passaic River via the PVSC Clay Street CSO. Paramount is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

90.    Defendant **Pitt-Consol Chemical Company ("Pitt-Consol")**, a subsidiary of Corteva Inc., is a corporation organized under the laws of the State of Delaware with its principal place of business at 974 Centre Road Building 735, Wilmington, Delaware.

91.    Pitt-Consol owned and operated at 191 Doremus Avenue from 1955 until 1983. From 1955 until 1983, Pitt-Consol continued operations at the property distilling and extracting products from coal tar, creosote oil, and their derivatives. Pitt-Consol's operations involved the use of PCBs in

at least three hot oil heat transfer systems. Hazardous substances including PCBs, mercury, lead, copper, and PAHs used at the property were found in site soil, site groundwater, and river sediments adjacent to the property. Tar-like materials used by Pitt-Consol or its predecessors were also found in the Roanoke Avenue outfall to the Passaic River in the 1970s. Pitt-Consol is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

92.     Defendant **PMC Global, Inc. (a/k/a Kleer Kast, a Division of PMC Inc.) ("PMC Global")** is a corporation organized under the laws of the State of Delaware with its principal place of business at PMC, Inc., 12243 Branford Street, Sun Valley, California. PMC Global has operated on a property located at 450 Schuyler Avenue, Kearny, New Jersey from 1971 to the present. From the late 1970s through at least 1999, operations at the property produced plastic products for the graphic arts, stationary, and packaging industries; cellulose acetate sheeting; acetate pellets; compounded and extruded cellulose; butyrate; propitionate; acetate tool handles; and plasticized compounds. There are documented releases of hazardous substances from the property to the Passaic River. Prior to July 1986, the property disposed of all wastewater to Frank's Creek, a tributary of the Passaic River. This disposal included stormwater and runoff as well as cooling water containing copper, mercury, lead, and PAHs. PMC Global is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

93.     Defendant **PPG Industries, Inc. ("PPG")** is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business located at One PPG Place, Pittsburgh, Pennsylvania. From approximately 1902 through 1971, PPG or its predecessors owned and operated a paint manufacturing facility at 29-75 Riverside Avenue in Newark, New Jersey. The property PPG operated at this location was so significantly contaminated with hazardous substances that USEPA identified it as a Superfund site in itself, responsible for releasing benzene, mercury,

chromium, and arsenic into the Passaic River as a means of disposal. PPG manufactured paint, varnish, linseed oil, lacquer, and resin at the property. Process wastes PPG generated at the property include PCBs, mercury, zinc, cadmium, copper, chromium, and lead. Sediments on or adjacent to the property are polluted with numerous hazardous substances, including dioxins, dioxin-associated compounds, lead, barium, cadmium, chromium, copper, PAHs, PCBs, and mercury. PPG Industries is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

94. Defendant **Passaic Valley Sewerage Commission ("PVSC")** is a public body politic and corporate authorized by statute with its principal place of business at 600 Wilson Avenue, Newark, New Jersey. The New Jersey Legislature created PVSC in 1902 with the stated purpose of relieving and preventing pollution in the Passaic River and its tributaries from Great Falls in Paterson to Newark Bay. In August 1924, PVSC began operating the Main Interceptor Sewer (also known as "the Trunk Line"), which since that time has collected and continues to collect untreated sewage and industrial wastes from tributary municipal sewer systems that had previously discharged to the Passaic River. The Trunk Line is 22 miles long, begins at Prospect Street in Paterson, New Jersey and generally follows the Passaic River along the west bank. The Trunk Line terminates in the City of Newark at PVSC's Sewage Treatment Plant Wastewater Reclamation Facility ("WWRF") at about 600 Wilson Avenue, Newark, New Jersey Before the Trunk Line became operational, most municipalities within PVSC's jurisdiction had developed individual sewer systems that discharged directly to the Lower Passaic River through discharge lines ending in outfalls on or near the banks of the Lower Passaic River. After the construction of the Trunk Line, those municipalities connected to the PVSC system.

95. PVSC's WWRF currently receives flow from 48 municipalities through three primary lines: the Trunk Line, the South Side Interceptor, and the Hudson County Force Main.

PVSC designed, constructed, installed, owns, operates, and has control over 59 active regulating chambers, and additional historic chambers not now in use, located within and along the Trunk Line and tributary PVSC sewers, through which untreated sewage, industrial wastewater, and stormwater have been and are from time to time still directed away from the PVSC WWRF to Combined Sewer Overflow ("CSO") outfalls and bypasses and discharged into the Passaic River. The Trunk Line and tributary PVSC and municipal sewers also have approximately 50 active CSO outfalls or bypasses, and additional historic outfalls or bypasses not now in use, through which untreated sewage, industrial wastewater, and stormwater have been and still periodically are discharged into the Passaic River.

96.    For decades, PVSC staff manually opened and closed its bypasses through chains linked to regulator valves or flaps. In the mid-1980s, PVSC designed, constructed, and now continues to operate remote controls to allow PVSC to control its bypass gates from a central control facility. The major bypasses discharged untreated sewage, industrial wastewater, and stormwater from multiple municipalities. When the Yantacaw Bypass was opened, all wastes upstream of the Third River were sent untreated to the Passaic River, including waste from the municipalities of Paterson, Haledon, Prospect Park, Hawthorne, Fair Lawn, Elmwood Park, Garfield, Clifton, Lodi, Passaic, Wallington, and East Rutherford. When the Union Outlet (Second River Bypass) was opened, the entire flow of untreated sewage, industrial wastewater, and stormwater from Montclair, Orange, Glen Ridge, Bloomfield, and East Orange was discharged directly to the Passaic River.

97.    PVSC received a New Jersey Pollution Discharge Elimination System Permit modification in or about November 2007 that required monitoring for PCBs. That monitoring shows that PCBs are discharged from the PVSC sewer system and its tributary sewers into the

Passaic River. Since the 1920's, the untreated sewage, industrial wastewater, and stormwater that PVSC has discharged to the Passaic River has contained and continues to contain Hazardous Substances including all of the 8 COCs. The PVSC system is a "facility" as that term is defined in 42 U.S.C. § 9601(9).   PVSC is liable under CERCLA because it accepted hazardous substances for transport from which there was a release or threatened release to the Site, the Facility, and the Passaic River that caused the incurrence of response costs by OxyChem in OU4, the Upper Nine, and pursuant to the 2023 OU4 UAO.

98.     Defendant **Purdue Pharma Technologies, Inc. ("Purdue")**, formerly known as Napp Technologies, Inc, Napp Chemicals, Inc., and B.L. Lemke & Co., is a corporation organized under the laws of the State of Delaware with its principal place of business at One Stamford Forum, 201 Tresser Boulevard, Stamford, Connecticut. Purdue operated a chemical and pharmaceutical manufacturing facility at 199 Main Street, Lodi, New Jersey from 1946 to 1995. Purdue's pharmaceutical operations utilized compounds containing mercury, lead, and copper in its pharmaceutical operations, and utilized oils containing PCBs and PAHs in its process equipment. There were two explosions that occurred at the Purdue facility: in 1969 and 1995. The 1995 explosion caused the evacuation of 400 residents of Lodi, and newspapers reported that the adjacent Saddle River turned fluorescent green from the chemically-contaminated water runoff. Site soil and groundwater contamination includes PCBs, mercury, lead, copper, and PAHs. These hazardous substances entered the Passaic River via industrial sewer overflows and direct discharges through the storm sewer, as well as runoff and sediment fallout from the two explosions, flooding, stormwater runoff, erosion of contaminated sediments, and groundwater migration from the Purdue Site to the Saddle River, which flows into the Passaic River. Purdue is liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

99.     Defendant **Sequa Corporation ("Sequa")** is a corporation organized under the laws of the State of Delaware with its principal place of business at 4100 RCA Boulevard, Palm Beach Gardens, Florida. Sequa owned and operated the property located at 185 Foundry Street, Newark, New Jersey from 1967 until December 1986.

100.     Defendant **Sun Chemical Corporation ("Sun Chemical")** is a corporation organized under the laws of the State of Delaware with its principal place of business at 35 Waterview Boulevard, Parsippany, New Jersey.

101.     Sequa manufactured organic pigments, including printing and news inks at the Foundry Street property. Sequa sold part of its business to Sun Chemical in 1986. In turn, Sun Chemical operated the property from 1986 or 1987 to 2003 and owned the property from 1990 to 2004. Sun Chemical manufactured organic pigments for automotive paints and plastics.

102.     Sun Chemical and/or Sequa received, used, manufactured, discharged, released, stored, and/or disposed of hazardous substances at the property, including but not limited to PCBs, mercury, benzenes, and chlorobenzenes. Defendants Sequa and Sun Chemical are liable under CERCLA for the disposal of hazardous substances to OU4 and the Upper Nine.

103.     Defendant **Spectraserv, Inc. ("Spectraserv"),** a privately held corporation owned by members of the Joseph P. Miele family, and a successor company to Modern Transportation Company, is a corporation organized under the laws of the State of New Jersey with its principal place of business at 75 Jacobus Avenue, Kearny, New Jersey. Spectraserv**,** then operating as Modern Transportation, began operating at 75 Jacobus Avenue, Kearny, New Jersey in 1962. From 1962 to the present, Spectraserv and its predecessors have accepted and disposed of municipal sludge from numerous federal, state, county, and local treatment works, as well as clean-out materials from anaerobic digesters from many publicly owned treatment works. In addition to domestic

sludges and digester clean-out materials, Spectraserv also accepted industrial wastes. Over the years, Spectraserv has expanded its business services to include digester and tank clean-out work, lagoon cleaning, and mechanical repairs at sewage treatment plants, in addition to dewatering and disposal services for municipal and industrial sludge. Hazardous substances stored, used, and/or produced at the property include copper, cupric sulfate, lead, mercury, and PCBs. Wastewater effluent samples collected in 2000 contained several hazardous substances, including copper and mercury. Spectraserv is liable for the release of hazardous substances to OU4 and the Upper Nine.

104.    Many of the Defendants sued herein were also defendants in earlier litigation filed in New Jersey under the Spill Act,[6] and in this Court under CERCLA.[7] Many of them sought and were denied motions to dismiss claims that they were liable for the discharges described above. The allegations as to these parties include the allegations that were previously sustained as sufficient to state a claim for relief in the New Jersey Litigation or in the *OxyChem* Action.

## VI.    CAUSES OF ACTION

### COUNT I: CERCLA COST RECOVERY UNDER SECTION 107(a)

105.    Plaintiff realleges and incorporates by reference paragraphs 1 through 104 as if fully set forth herein.

---

[6] Many of the Defendants in this action were also third-party defendants in *NJDEP, et al. v. Occidental Chemical Corp., et al.*, Docket No. ESX-L9868-05 (PASR), in the Superior Court of New Jersey, Essex County (the "New Jersey Litigation"). In the New Jersey Litigation, the third-party defendants were sued under the New Jersey Spill Act regarding remediation costs incurred prior to the issuance of the 2023 OU4 UAO at issue here. "Nexus packages" for each third-party defendant containing evidence of the defendants' releases of hazardous substances into the Passaic River were filed in the New Jersey Litigation and are available at www.nj.gov/dep/passaicdocs/thirdparty-tierra.html (last visited July 20, 2022).

[7] *Occidental Chemical Corp. v. 21st Century Fox Am., et al.,* No. 2:18-cv-11273 (MCA)(LDW).

106.    Each Defendant named above is jointly and severally liable under CERCLA Section 107, 42 U.S.C. §9607, for the response costs OxyChem has incurred and will incur under the 2023 OU4 UAO as a consequence of each Defendant's disposal, arrangement for disposal, or transport for disposal of hazardous substances released into OU4 and the Upper Nine.

107.    Defendants are liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a), because each Defendant is a person as defined by CERCLA § 601(21), 42 U.S.C. § 9601(21), who (1) owns and/or operates a portion of the Facility from which there has been a release or threatened release of hazardous substances into OU4 and the Upper Nine; (2) owned and/or operated a portion of the Facility at the time hazardous substances were disposed of, from which there was a release or threatened release of hazardous substances into OU4 or the Upper Nine; (3) arranged for disposal, treatment, or transport for disposal or treatment at the Facility of hazardous substances it or they owned or possessed, from which there was a release or threatened release of hazardous substances into OU4 or the Upper Nine; and/or (4) transported hazardous substances to the Facility, having selected it for treatment or disposal of such hazardous substances, from which there was a release or threatened release of hazardous substances into OU4 and the Upper Nine.

108.    Each release or threatened release of hazardous substances described above has caused and will continue to cause Plaintiff to incur necessary response costs to comply with the 2023 OU4 UAO that are consistent with the NCP.

109.    Under CERCLA Section 107(a)(4)(B), 42 U.S.C. §9607(a)(4)(B), Plaintiff is entitled to cost recovery from each Defendant for necessary response costs consistent with the NCP that Plaintiff has incurred or will incur to comply with the 2023 OU4 UAO.

WHEREFORE, Plaintiff requests that the Court enter a judgment in its favor and against each Defendant as follows:

44

(a)     Declaring that each Defendant is jointly and severally liable under 42 U.S.C. §9607(a)(4)(B) for response costs incurred or to be incurred by Plaintiff as a result of each Defendant's disposal, arrangement for disposal, or transport for disposal of hazardous substances at the Facility and their release into OU4 and the Upper Nine;

(b)     awarding Plaintiff an amount determined by the Court to satisfy the obligation of each Defendant for all necessary response costs consistent with the NCP that Plaintiff has incurred or will incur in connection with the 2023 OU4 UAO, and work performed in identifying other PRPs for such response costs;

(c)     awarding Plaintiff prejudgment interest, costs, and attorneys' and expert fees as allowed by law and such other and further relief as the Court determines is just, equitable, and appropriate.

## COUNT II: CERCLA DECLARATORY JUDGMENT

110.    Plaintiff realleges and incorporates by reference paragraphs 1 through 104 as if fully set forth herein.

111.    Each Defendant named above is jointly and severally liable under CERCLA Section 107, 42 U.S.C. §9607, for the response costs OxyChem has incurred and will incur under the 2023 OU4 UAO as a consequence of each Defendant's disposal, arrangement for disposal, or transport for disposal of hazardous substances at the Facility and their release into OU4 and the Upper Nine.

112.    Defendants are liable under CERCLA Section 107(a), 42 U.S.C. §9607(a), because each Defendant is a person as defined by CERCLA § 601(21), 42 U.S.C. § 9601(21), who (1) owns and/or operates a portion of the Facility from which there has been a release or threatened release of hazardous substances into OU4 and the Upper Nine; (2) owned and/or operated a portion of the Facility at the time hazardous substances were disposed of, from which there was a release

or threatened release of hazardous substances of into OU4 or the Upper Nine; (3) arranged for disposal, treatment, or transport for disposal or treatment at the Facility of hazardous substances it or they owned or possessed, from which there was a release or threatened release of hazardous substances into OU4 or the Upper Nine; and/or (4) transported hazardous substances to the Facility, having selected it for treatment or disposal of such hazardous substances, from which there was a release or threatened release of hazardous substances into OU4 and the Upper Nine.

113.    Each release or threatened release of hazardous substances described above has caused and will continue to cause Plaintiff to incur necessary response costs consistent with the NCP to comply with the 2023 OU4 UAO.

114.    An actual controversy exists, within the meaning of 28 U.S.C. § 2201 and CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), between Plaintiff and Defendants regarding their respective rights and responsibilities for necessary response costs incurred and to be incurred by Plaintiff consistent with the NCP in connection with the 2023 OU4 UAO.

115.    Pursuant to CERCLA Section 113(g)(2), 42 U.S.C. §9613(g)(2), and 28 U.S.C. §§2201-2202, Plaintiff is entitled to a declaratory judgment on liability for response costs and damages under CERCLA Section 107(a), 42 U.S.C. §9607(a), that will be binding in any subsequent action or actions to recover further response costs under the 2023 OU4 UAO, and work performed in identifying other PRPs for response costs.

WHEREFORE, Plaintiff requests that the Court enter a judgment in its favor and against each Defendant as follows:

(a)     declaring that the Defendants are liable, jointly and severally, for response costs incurred and to be incurred by Plaintiff resulting from Defendants' disposals, arrangement for disposals, and transport for disposals of hazardous substances at the Facility;

(b)     declaring that the Court's judgment on each Defendant's liability for response costs and/or damages is binding on any subsequent action or actions to recover further response costs or damages;

(c)     awarding Plaintiff an amount determined by the Court to satisfy the obligation of each Defendant for all necessary response costs incurred and to be incurred by Plaintiff, in connection with the 2023 OU4 UAO, and work performed in identifying other PRPs for such response costs; and

(d)     awarding Plaintiff prejudgment interest, costs, and attorneys' and expert fees as allowed by law and such other and further relief as the Court determines is just, equitable, and appropriate.

Respectfully submitted,

LANGSAM STEVENS SILVER &
HOLLAENDER LLP

Dated: March 24, 2023

By: ___*s/ John J. McDermott*___
John J. McDermott, Esq.
(jmcdermott@lssh-law.com.com)
Lauren E. Krohn, Esq.
65 South Main Street, Suite B102
Pennington, NJ 08534
Tel. (856)727-0315

GIBBS & BRUNS, LLP
Kathy D. Patrick, Esq.*
(kpatrick@gibbsbruns.com)
Anthony N. Kaim, Esq.*
Jorge Gutierrez, Esq.*
Ann Lebeck, Esq.*
Nick Beachy, Esq.*
1100 Louisiana, Suite 5300
Houston, TX 77002
Tel: (713) 650-8805
Fax: (713) 750-0903

LANGSAM STEVENS SILVER &
HOLLAENDER LLP
Larry D. Silver, Esq.*
(lsilver@lssh-law.com)
David E. Romine, Esq.*
Amanda Rauer, Esq.
1818 Market Street, Suite 2430
Philadelphia, PA 19103
Tel: (215) 732-3255
Fax: (215) 732-3260
*Attorneys for Plaintiff*
*Occidental Chemical Corporation*

\* *Pro hac vice* application to be filed

## <u>LOCAL RULE 11.2 CERTIFICATION</u>

The undersigned hereby certifies, pursuant to 28 U.S.C. §1746, that the matter in controversy in the foregoing Complaint Under CERCLA Section 107 is related to the matters listed below, in that they concern a similar subject matter and involve some of the same parties:

1.     *N.J. Dept. of Envtl. Prot. v. Occidental Chem. Corp., et al.*, Docket No. ESX-L-9868-05 in the Superior Court of New Jersey, Law Division (the "NJDEP Litigation"). While many Defendants in the instant action were third-party defendants in the NJDEP Litigation, the claims against each of those third-party defendants were resolved. The actions currently pending in the Law Division involve cross-claims among Occidental Chemical Corporation, Repsol, S.A., and Joseph J. Farnan, Jr., as Liquidating Trustee for the Maxus Liquidating Trust, none of whom are Defendants in the instant action.

2.     *In re Maxus Energy Corp.*, Case No. 16-11501 in the United States Bankruptcy Court for the District of Delaware;

3.     *Occidental Chemical Corporation v. 21st Century Fox America, Inc.*, et al., Case No. 2:18-cv-11273 in the United States District Court for the District of New Jersey; and

4.     *United States of America v. Alden Leeds, Inc.*, et al., Case No. 2:22-cv-07326 in the United States District Court for the District of New Jersey.


   */s/ John J. McDermott*
John J. McDermott, Esquire