# Exhibit C



David G. Mandelbaum
Tel 215.988.7813
Fax 215.717.5201
mandelbaumd@gtlaw.com

**VIA EMAIL AND UPS NEXT DAY AIR**　　　　　　　　　　　　　　February 13, 2018

Juan M. Fajardo, Esquire
Office of Regional Counsel
USEPA, Region 2
290 Broadway
17th Floor
New York, NY 10002

Re:　**Lower Passaic River Site / Planned Allocation of Responsibility for Operable Unit 2**

Dear Juan:

I am writing on behalf of this firm's client, Benjamin Moore & Co., concerning the allocation process that the Environmental Protection Agency ("EPA") has designed and is intending to implement using David Batson as the assigned allocator ("the Batson allocation"). I make specific reference to Eric Wilson's letter of January 5, 2018, to the Diamond Alkali – Lower 8.3 Miles Contact Group. I intend this letter to supplement the views of the Small Parties Group ("SPG"), transmitted by letter dated January 30, 2018, which Benjamin Moore endorses.

We are not aware of any evidence demonstrating that Benjamin Moore released dioxins, furans, or polychlorinated biphenyls to the Lower Passaic River from its facility, which is located next to the Diamond Shamrock Site on Lister Avenue. Whether EPA ultimately agrees with that proposition or not, Benjamin Moore has reservations about the allocation process as currently envisioned that Benjamin Moore wishes to reiterate at this time.

　　a.　The Batson Process Is Not Authorized by CERCLA.

There appears to be no statutory basis for the Batson allocation –which can be summed up as an EPA-improvised process for organizing certain information and allocating measures of OU2 responsibility in anticipation of a court-approved endorsement of settlement. But Congress has already mandated the process for an allocation in aid of settlement – a nonbinding preliminary allocation of responsibility ("NBAR") – in section 122(e)(3) of Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"). EPA issued guidelines for NBARs at 52 Fed. Reg. 19,919 (May 28, 1987). Per the EPA's guidelines, an NBAR is intended only as an aid to settlement among those parties who participate and EPA, and not as a justification for a contested settlement. The very nature of an NBAR confirms its more limited purpose; an NBAR is a voluntary allocation process, the results of which (i) may be adjusted by the PRPs after preparation, and (ii) cannot be introduced in any court proceeding (including one for the entry of a consent decree).

Juan M. Fajardo, Esquire
February 5, 2018
Page 2

In contrast to an NBAR, the Batson allocation is neither voluntary nor nonbinding. While EPA and Mr. Batson on the one hand, and many of the noticed parties on the other, have talked about parties electing not to participate in the allocation process, Mr. Batson has advised that EPA has directed him to make an allocation to every noticed party unless that party was offered and accepted an early cash-out[1] or is one of the noticed parties specifically excluded from the allocation process.[2] No so-called "allocation party" has the ability to opt out of, or to adjust, this allocation, including the parties that neither consent to it nor participate.

In short, while Benjamin Moore is not endorsing an NBAR proceeding for the Passaic River allocation, Benjamin Moore is not aware of any statutory provision or regulation that permits EPA to depart from an NBAR and develop an alternative *mandatory* settlement process. Absent such a basis, the Batson allocation is not authorized by the statute, and the costs incurred to implement it are neither costs of response incurred consistent with the national contingency plan, nor reasonable enforcement costs. Moreover, rather than accepting the Batson allocation as a basis for a settlement order, a court will likely reject the Batson allocation as inconsistent with CERCLA's requirements.

To be clear, Benjamin Moore believes that parties who wish to attempt settlement can use whatever they like to help them. They just cannot force others into that process, nor can they use that process to show a resulting settlement to be fair, reasonable, or consistent with CERCLA. If Mr. Batson's process, trial by combat, or a Ouija board would help, by all means it should be used, but that is for the parties seeking the help, and not any subsequent court.

   b. The EPA Allocation Process is Arbitrary and Promotes a Piecemeal Settlement that Invites Challenge.

The EPA allocation process treats similarly situated parties differently, and thus is entirely arbitrary. Nowhere is this clearer than with respect to EPA's decision to pursue an entirely separate settlement process with the Passaic Valley Sewerage Commission ("PVSC" or "the POTW") and certain municipalities. EPA has stated its decision not to pursue the PVSC's significant industrial users, which account for several thousand responsible parties. And yet, although several of the noticed allocation parties are connected to the Passaic River only through their use of the POTW, EPA has arbitrarily maintained those parties, but not PVSC, bear responsibility for purposes of this allocation. If there is a principled reason for treating the POTW separately, then that reasoning surely applies likewise to parties whose sole connection to OU2 liability is through the POTW. If that is not the case, then all parties potentially responsible for contamination to the River solely through use of the POTW, including but not limited to those noticed to date, should be included in the Batson allocation.

---

[1] This is yet another example of the unfairness of the Batson allocation. The early cash-out settlements previously offered by EPA to select parties was predicated on EPA's assessment that these parties had not released *any* contaminant of concern ("COC") to the Passaic River. Yet those selected parties who refused to accept the cash-out offer – i.e., to pay an arbitrary cash-out amount for having no liability at all – are nonetheless expected to participate in the Batson allocation at considerable expense.

[2] The parties excluded from the Batson allocation include the Passaic Valley Sewerage Commission and certain municipalities.

Juan M. Fajardo, Esquire
February 5, 2018
Page 3

A separately negotiated settlement between EPA and PVSC and others only reinforces the appearance that EPA is only looking to justify early (in-kind) settlements, rather than to promote a comprehensive settlement of OU2 responsibility without litigation. Under the guidelines, an NBAR should allocate 100 percent of the costs of the remedial action – rather than carve out costs to address in separate proceedings. Moreover, EPA's approach appears to disregard section 113(f)(2) of CERCLA, as there is no suggestion that these early settlements will be structured to assure a reduction in the liability of non-settling parties by the amounts of the settlements EPA does reach in these separate proceedings.

The Batson allocation is not positioned as constructed to reach a settlement for 100 percent of the costs of the remediation or any consensus among those who are the most responsible. Rather, insofar as it eschews a comprehensive, unbiased, and informed allocation, the Batson allocation appears designed solely to promote early settlements for a set of parties selected by EPA through an exercise of discretion. If the purpose of the Batson allocation is simply to provide EPA with justification for settlements with the parties responsible for the smallest shares, then that ought to be the only outcome of the process. Mr. Batson can sort the parties into two groups; those who meet EPA's criteria for cash-out offers and those that do not. Further allocation will be counter-productive and invite litigation.

Benjamin Moore favors attempts to reach a reasonable and fair allocation of shared OU2 responsibility, consistent with CERCLA and without litigation. However, the Batson allocation is not designed to aid settlement – which ought to be the only rationale for an allocation prepared by EPA or on EPA's behalf. In fact, the Batson allocation will inevitably result in the very protracted litigation that presumably all parties, including EPA and Benjamin Moore, seek to avoid. Ultimately, it is the court, not EPA, that is qualified to prepare a binding allocation; and any administrative settlement effort must be intended to mimic the likely judicial allocation if it is intended to promote a consensual, rather than litigated, result. But the allocation process as planned does very little to replicate a litigated equitable allocation (which would include review of relevant documents and expert analysis) under section 113(f)(1) of CERCLA. While Benjamin Moore hopes to receive a cash-out offer, the value of the offer will be diminished if it does not withstand challenges from non-settling parties.

Benjamin Moore will participate in Mr. Batson's process if the process goes forward because it has no choice; Mr. Batson will assign a share to Benjamin Moore whether Benjamin Moore participates or not. Neither EPA nor any other party should interpret Benjamin Moore's active participation as waiver of any claim, defense, or position concerning the reasonableness or lawfulness of the allocation, the recoverability of the costs of the allocation under CERCLA or other law, or the propriety of any settlement based upon the allocation or the allocation report.

Very truly yours,

David G. Mandelbaum

cc: David C. Batson, Esq.